[No. A132431. First Dist., Div. One. May 29, 2012.]

NELSON THOMAS, Plaintiff and Appellant, v.
ERLAND L. STENBERG et al., Defendants and Respondents.

COUNSEL

Law Offices of George B. Altenberg, Jr., George B. Altenberg, Jr.; Cochran Erickson and Charles D. Cochran for Plaintiff and Appellant.

Philip M. Andersen & Associates and Jeanette N. Little for Defendants and Respondents.

OPINION

**DONDERO, J.**—Plaintiff Nelson Thomas appeals from the judgment of nonsuit after the trial court entered its order granting the motion of defendants Erland L. Stenberg, Maryann Stenberg, and E Lazy S Land and Livestock, Inc. (collectively referred to herein as defendants), for nonsuit. Plaintiff claims the court erred in concluding defendants did not have a legal duty to take measures to protect him from the harm that occurred when the motorcycle upon which he was riding collided with a cow on a private road passing through defendants' property. We affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 19, 2010, plaintiff filed a complaint against the Stenbergs, alleging causes of action for general negligence and premises liability.[1]

---

[1] Although the first page of the form complaint also references strict liability, plaintiff failed to plead facts or attach a form specifically articulating a strict liability cause of action.

Plaintiff alleged that on April 24, 2008, a cow charged him while his motorcycle was stopped on a paved road located within the E Lazy S Ranch in Petaluma. He sustained injuries as a result of the impact. He claimed the accident was a proximate result of the defendants' negligent failure to warn him "of the inherently dangerous animal which was not contained in a fenced area."

On February 28, 2011, an amendment to the complaint was filed adding E Lazy S Land and Livestock, Inc., as a defendant.

On March 30, 2010, defendants filed their answer to the complaint.

The trial in this matter commenced on April 15, 2011.

On May 4, 2011, at the close of plaintiff's evidence, the trial court filed its order granting defendants' motion for judgment on nonsuit. Judgment was entered in favor of defendants. This appeal followed.

## DISCUSSION

### I. *Standard of Review*

"We independently review an order granting a nonsuit, evaluating the evidence in the light most favorable to the plaintiff and resolving all presumptions, inferences and doubts in his or her favor. [Citations.] 'Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is "some substance to plaintiff's evidence upon which reasonable minds could differ . . . ." ' [Citation.] In other words, '[i]f there is substantial evidence to support [the plaintiff's] claim, *and* if the state of the law also supports that claim, we must reverse the judgment.' [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1124–1125 [76 Cal.Rptr.3d 585], original italics.)

### II. *Plaintiff's Case*

#### A. *The Private Road*

The road upon which the accident occurred is a one-mile-long private road that crosses pasture owned by defendants, as well as land owned by other parties. The road provides ingress and egress to a cluster of "landlocked"

houses, including a house belonging to Jackly Bentley (plaintiff's aunt) and her husband. About eight family dwellings are serviced by the road, which is classified as an easement where it passes through defendants' property. The easement itself is owned by the Bentley family and the Dolcini family. The private road lies off Chileno Valley Road, which is a public road. There is a cattle guard that marks where the public road meets the private road.

The distance from Chileno Valley Road to the start of defendants' property along the private road is about a half-mile. The road initially crosses the pasture owned by the Dolcini family. Here, the road is comprised of dirt and gravel. The Dolcinis' property is also used as cow pasture and there has never been a fence on either side of the private road. At this point, the surrounding land is mostly open pasture. As the road continues, it meets another cattle guard marking the entrance to defendants' property. The distance between this cattle guard and the Bentleys' home is about a quarter-mile. The road through defendants' portion of the land is paved. As the road passes through defendants' property, trees become more prevalent.

B. *Plaintiff's Testimony*

Plaintiff was 46 years old at the time of trial and had been acquainted with the entire ranch land since the age of five. Alex Bentley is his uncle. The Bentleys own about 10 acres of land on this ranch property. Plaintiff has traveled down the private road thousands of times and has driven a motor-cycle down the road at various times over the past 31 years.

On the date of the accident, plaintiff was riding his Triumph Tiger motorcycle on his way to visit the Bentleys at their home. Upon turning off Chileno Valley Road onto the private road, he maintained a speed of 10 to 15 miles per hour over the gravel and dirt portion of the road. The Dolcinis have posted a speed limit sign here of 12 miles per hour. Plaintiff testified that on the day of the accident he might have accelerated up to 25 to 30 miles per hour upon reaching the paved portion of the road that runs through defend-ants' land. Initially, he observed several cows about 100 yards in front of him standing off to his right. At some point, the road passes through an area having a barbed wire fence that goes down to a creek. There is also a telephone pole in the vicinity. Just past this point he saw a black cow off in the shadows about 30 yards to his left.

As he approached, plaintiff noticed the cow starting to move towards him. He began slowing down as she started running towards the road. He thought she was probably just going to try to run across the road. As he got closer, he

saw that she was coming right at him and he applied his brakes. She put her head down and crashed into his gas tank and his shoulder. He was thrown over the handlebars and landed on his left shoulder. The bike was lifted in the air and dropped on its left side, after which it slid sideways down the road. The motorcycle was a total loss. Plaintiff suffered injury to his shoulder, which eventually required surgery.

## C. *Erland Stenberg*

Erland Stenberg testified that his Petaluma ranch consists of approximately 450 acres. He breeds cows on the ranch and sells about 35 to 40 calves a year. Stenberg was born and grew up on a ranch in North Dakota. He lived on the ranch until he left home to go to college. His family raised Hereford cattle and farmed grain. His wife Maryann also grew up on a ranch. At the time of the accident, he had around 75 Angus cows and one bull. Most of the cows were ones he had raised from calves. He started his herd from nine cows that he bought in the fall of 1994. He and his wife operate the ranch themselves. Stenberg testified that Angus cattle are not considered to be the most aggressive breed of beef cattle.

The cow named "Annie" was born in 2003. Stenberg testified that his cows were gentle, such that his wife could walk up to almost any of them to pet them and give them apples. However, his wife did state in her deposition that she did not let her young grandchildren walk down the easement road unsupervised because cows can mistake small children for predators such as coyotes or dogs. Stenberg testified that there had never been an occasion where his cows had attacked anyone.

When cows are close to calving, the Stenbergs move them to the portion of the pasture that is bisected by the private road. At the time of the accident there were probably 20 to 25 cows that had been left to calve on that portion of the pasture. The Stenbergs had placed Annie in that area as she appeared to be about a week or two away from giving birth. Stenberg's wife would check the cows at least once a day to see if they had given birth or were just about to do so.

Stenberg testified that the Bentleys have rights to the private road where it runs through his ranch pursuant to an easement. The Bentleys are the dominant tenement of the easement. While the Stenbergs own the underlying property, they are the subservient tenement with respect to the easement;

therefore, according to Stenberg, the Bentleys have as much obligation for maintenance of the road as he does. At one point, Stenberg did offer to allow the Bentleys to construct a fence along the easement provided they contributed money to do so. When he first acquired the property, the entire length of the easement road was dirt and gravel. Stenberg spent about $25,000 to widen the road, put in culverts, and build the grade for the portion of the road that passes through his property. Sometime later, Alex Bentley contributed $8,000 towards paving the road and another neighbor contributed $5,000. Stenberg paid the rest. The pasture that this private road goes through is fenced all the way around, including cattle guards placed at the entrance to the property. The cows will cross this road to get from one side to the other to graze.

On the 11th day after the accident,[2] Stenberg and his wife were moving their cattle and trying to find Annie. That night, he had a heart attack and was hospitalized. While he was recuperating, his wife found Annie and noted that she had either lost or aborted her calf. His wife also noticed that Annie had a limp. Late in May 2008, he received telephone calls from plaintiff's insurance company telling him that an accident had occurred on Chileno Valley Road involving a vehicle and one of his cows. He informed the caller that he did not live on Chileno Valley Road and that all of his cattle were properly fenced in, a mile back off that road. He turned the matter over to his attorney and hired a private investigator.

## D. *Dr. Marc Horrell*

Dr. Marc Horrell is a veterinarian who testified for plaintiff on the issue of the temperament and behavior of cattle. He testified that beef cattle tend to be less docile than dairy cattle. With respect to beef cattle, Herefords are generally more docile than Angus, and Red Angus tend to be more docile than the Black Angus. In contrast, Brahman cattle are very high strung. As a veterinarian, Horrell does not use any special technique to handle Angus cows. He stated that cows that have recently had a calf tend to be much more aggressive than cows without calves, as the mothers tend to be especially protective of newborn calves. He also testified that a 1,200-pound cow is capable of using its head to butt up against a motorcycle and lift it or knock it over.

On cross-examination, Horrell stated that even within the various breeds, cattle behavior varies from cow to cow and one can see the whole range of behavior from aggressive to mellow in cows of the same breed. Angus cow behavior could include running away from the sound of a motorcycle or from a motor vehicle traveling at them at a speed of about 25 miles per hour. He

---

[2] The Stenbergs were not actually notified about the accident until weeks after it occurred.

also testified that he had never seen the cow that was involved in this accident and therefore did not know whether this particular cow was gentle or not. When cows are behaving aggressively, they will typically use their heads to knock someone over. If a person is standing behind them, they may try to kick him or her with their hind legs. However, they do not typically turn around to kick at a person with their hind legs.

### E. *Jackly Bentley*

Jackly Bentley, plaintiff's aunt, testified that when her now adult son was seven years old there were several occasions when he and his friends were accosted by aggressive cows while walking on the easement, to the extent that they would have to climb a tree, jump over a fence, or use the creek to avoid being confronted by the cows. On the day of the accident, plaintiff arrived at the Bentleys' home and she realized he was injured. Later, she went to the scene and photographed the road where the accident had occurred. She also took a photo of the motorcycle. Bentley admitted that she and the Stenbergs do not like each other.

On cross-examination, Bentley stated that in the year before the accident, members of all the families living on the property had regularly driven motorcycles on the private road across the Stenbergs' land. She conceded it is common knowledge that one might have to avoid cows on the easement, as the road passes through ranch land where cows graze. As far as she was aware, during the past 40 years there had never been any vehicular accident on the private road easement across the Stenbergs' property, apart from the one involving her nephew. On cross-examination, Bentley admitted that she has never offered to pay for the construction of a fence on either side of the easement.

### F. *Arthur Koenig*

Arthur Koenig testified for plaintiff as an expert regarding accident reconstruction. In his opinion, the accident was caused by a cow colliding with the left side of the motorcycle, hitting the motorcycle and plaintiff's body. He had reviewed a report prepared by another expert who opined the motorcycle was traveling at least 10 miles per hour at the time of the collision with the cow.

### III. *The Motion for Nonsuit*

At the close of plaintiff's case, defendants moved for nonsuit. The trial court noted that it had been unable to find any legal duty on the part of a landowner to construct a fence in this context, particularly in the absence of

any prior event that would have alerted the property owner to the need to undertake such a measure. In arriving at its decision, the court stated the following: " 'One can conjure up all manner of extreme measures which might have prevented this particular injury, but that is not the issue in defining duty. The fundamental inquiry is whether the duty of a property owner to exercise reasonable care in preventing injury to persons required such measures. The duty here is one of ordinary care, one of reasonable care. This standard is necessarily incompatible with extreme preventive measures borne of an unbounded imagination.' "[3] Agreeing with plaintiff that the case "came down to whether there was a duty to put a fence up," the court stated it could not find legal obligation for defendants to have done so. The court observed that while there is a duty to prevent livestock from entering a public road, there is no commensurate duty to prevent them from accessing a private driveway that other people have the right to use.

## IV. *Negligence and Duty of Care*

■ To succeed in a negligence action, the plaintiff must show that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the duty, and (3) the breach proximately or legally caused (4) the plaintiff's damages or injuries. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207], disapproved on another point in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, fn. 5 [113 Cal.Rptr.3d 327, 235 P.3d 988].) Regarding duty, "Under general negligence principles, . . . a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716 [110 Cal.Rptr.2d 528, 28 P.3d 249].) "Whether a given case falls within an exception to this general rule, or whether a duty of care exists in a given circumstance, 'is a question of law to be determined on a case-by-case basis.' [Citation.]" (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70] (*Parsons*).)[4]

" ' "[D]uty" is not an immutable fact of nature " 'but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection.' " [Citation.]' [Citation.] Some of the considerations that courts have employed in various contexts to

---

[3] The trial court's language appears to have been taken from the opinion in *Shively v. Dye Creek Cattle Co.* (1994) 29 Cal.App.4th 1620, 1631 [35 Cal.Rptr.2d 238] (*Shively*).

[4] A necessary element of claims for both negligence and premises liability is the existence of a legal duty to the plaintiff. (*Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1369 [50 Cal.Rptr.3d 40].)

determine the existence and scope of duty are: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]' " (*Parsons, supra*, 15 Cal.4th 456, 472–473, quoting *Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624] and *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561].)

## V. *Whether Defendants Owed Plaintiff a Duty of Care*

Plaintiff does not directly address the duty of care analysis as set forth in *Parsons*. Instead, he raises three disparate arguments, which we consider below. Preliminarily, we observe he has distorted the appellate record in his opening brief. For example, he states Horrell testified to the effect that "Angus cattle as a breed are particularly prone to aggressive, belligerent and combative behavior, more so when calves are present." In actuality, as noted above, Horrell testified that Angus cattle are generally less docile than Herefords but more docile than Brahman cattle. Thus, there was no testimony that Angus cattle are "particularly prone" to aggressive behavior. Horrell also testified that within a particular breed, individual cows have their own temperaments, with some being more docile than others.

Plaintiff also misstates the record when he asserts his aunt testified that after the accident she had a conversation with Maryann Stenberg in which the latter "admitted that their Angus do have aggressive behavioral characteristics rendering them dangerous instrumentalities." In fact, the conversation plaintiff refers to actually took place approximately *14 years* before the accident occurred.[5] In that conversation, Maryann Stenberg advised Bentley that the cows were more aggressive when they had calves and opined it would be best not to allow her young child to walk along the easement alone.

### A. *Whether the Stenbergs Owe a Duty as Owners of the Easement*

Relying on our opinion in *Cody F. v. Falletti* (2001) 92 Cal.App.4th 1232 [112 Cal.Rptr.2d 593] (*Cody F.*), plaintiff asserts "easement owners such as [defendants] owe duties to third parties injured on the easement." The argument fails.

---

[5] The distortion of the record is particularly egregious given that the author of plaintiff's opening brief is the same attorney who represented him at trial and who elicited Bentley's testimony.

In *Cody F., supra*, 92 Cal.App.4th 1232, 1243, we noted that an easement owner "has no possessory right in the land beyond the limited use of the land granted by the easement," and we explained that "The nature of the duty owed by the owner of an interest in real property must have a relationship to the degree of control conferred by the scope of the ownership interest itself," and "An easement interest does not necessarily translate into a tort duty." (*Ibid.*) In that case, a minor, his mother and his sister brought a personal injury and premises liability action against the landowners in a planned development subdivision who were members of the property owners association and owned nonexclusive access easements over a private road within the subdivision, alleging the defendants were negligent in failing to prevent a specific property owner from violating association rules by allowing his guard dogs to escape from his property and attack the child on the private road. (*Id.* at pp. 1236–1237.)

Appealing judgments for the defendants, the plaintiffs claimed that "all easement holders are liable to the same extent as any landowner for anything that occurs on the easement." (*Cody F., supra*, 92 Cal.App.4th 1232, 1241.) Rejecting that claim, we affirmed the judgments, holding that "the easement owners did not have any duty of care to prevent the harm that occurred." (*Id.* at p. 1236.) Finding the defendant easement owners did not have a right of control over the road, we explained that although a duty clearly arises for one who "creates and controls" (*id.* at p. 1243) the potential risk of harm, the law "does not impose responsibility where there is no duty because of the absence of a right to control." (*Id.* at p. 1241.) We explained that "The right of control that attends ownership of an easement has a narrower scope than the right of control that accompanies fee ownership of real property. Therefore, the corresponding duty to third parties in managing the property interest must also be narrower in scope and tied to the reason that the easement is granted." (*Id.* at p. 1246.)

 In the present case, we note it was undisputed at trial that while defendants own the underlying property, they do not own the easement. Instead, the easement is owned by the Bentleys and the Dolcinis, who use it to access their individual properties. Thus, plaintiff's argument is entirely inapposite and his reliance on *Cody F.* is acutely misplaced. Moreover, while plaintiff claims *Cody F.* "has directives that would impose liability on [defendants]," it is well established that cases do not stand for propositions not addressed therein: " 'It is axiomatic . . . that a decision does not stand for a proposition not considered by the court.' [Citation.]" (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 332 [87 Cal.Rptr.2d 423, 981 P.2d 52].)

B. *Liability for Dangerous Animals*

■ Plaintiff next correctly notes that a keeper of an animal of a species that is dangerous by nature, or that a keeper knows or has reason to know has dangerous propensities or traits, may be found strictly liable to anyone injured as a result of those propensities or traits: "The doctrine of strict liability for harm done by animals has developed along two separate and independent lines: (1) Strict liability for damages by trespassing livestock, and (2) strict liability apart from trespass (a) for damages by animals of a species regarded as inherently dangerous, and (b) for damages by animals of a species not so regarded but which, in the particular case, possess dangerous propensities which were or should have been known to the possessor." (*Williams v. Goodwin* (1974) 41 Cal.App.3d 496, 501–502 [116 Cal.Rptr. 200], fns. omitted (*Williams*).) Not surprisingly, plaintiff does not cite to any cases holding that Angus cows have an inherently dangerous nature, and our research has disclosed no such cases. In fact, relevant cases state the opposite.

For example, in *Thompson v. Lee* (Ind.Ct.App. 1980) 402 N.E.2d 1309, an opinion of the Indiana Court of Appeals, a motorcyclist asserted a claim against the owner of a Black Angus cow that had escaped from a fenced field and wandered onto a county road. The motorcyclist struck the cow and sustained severe injury as well as property damage. Initially, the plaintiff brought his claim under a strict liability theory; however, the complaint was dismissed by the trial court and the plaintiff ultimately proceeded under a negligence claim. One of the issues on appeal was whether a strict liability theory could have been asserted under the above set of facts. In discussing whether strict liability may be imposed on the owners of animals which have caused injury, the court referenced the principle that liability may be found in the context of an attack by a naturally ferocious or dangerous animal. The court concluded: "It is well-settled in this State that cattle are not naturally ferocious or dangerous animals and that an owner is not strictly liable for injuries caused by the animal unless the owner had knowledge of a vicious propensity of a particular animal." (*Id.* at p. 1311.)[6]

As to whether the Stenbergs had knowledge, constructive or actual, of Annie's alleged dangerous tendencies, we observe no evidence whatsoever was presented at trial concerning the cow's propensities, let alone as to defendants' awareness of such propensities. Plaintiff's expert, Horrell, did not evaluate the cow, and none of plaintiff's witnesses provided any testimony regarding the nature and tendencies of this particular animal. Any evidence as to the aggressive nature of Angus cows generally, or as to cows that have

---

[6] California courts have noted the same: "Cattle consist of species which are not regarded as inherently dangerous." (*Williams, supra*, 41 Cal.App.3d 496, 501, fn. 4.)

recently given birth, does not go to show whether Annie herself possessed any unusually dangerous traits.

Citing to *Barnett v. La Mesa Post No. 282* (1940) 15 Cal.2d 191, 194 [99 P.2d 650], plaintiff asserts that even when an animal has not previously manifested a dangerous trait, failure to provide for or exercise control over an animal has been determined to result in liability. In *Barnett*, the Supreme Court overturned a nonsuit, noting that animal owners can be held liable in negligence if they carelessly mishandle an animal, whatever its character. (*Id.* at pp. 194–195.)[7]

■ Here, there was no evidence that the Stenbergs were negligent in their conduct with respect to Annie. As noted above, there was no evidence as to Annie's nature and tendencies. Additionally, there was no evidence suggesting that a reasonable rancher would not allow cows to graze in pasture bisected by a private road, or that he or she would have taken steps to guard against any danger that a cow with a young calf might pose to persons driving on that road. In effect, under plaintiff's rationale, liability could be imposed on the unwitting owner of an otherwise apparently peaceful animal whenever that animal happens to cause injury to another person, even in the absence of any negligence whatsoever. This is manifestly not the law in our state. Accordingly, plaintiff's argument fails.

C. *Duty to Keep Highway Clear Under Food and Agricultural Code Section 16904*

Plaintiff cites to Food and Agricultural Code section 16904[8] and Civil Code section 1714 for the proposition that cattle owners are not exempt from a duty to exercise ordinary care or skill in the management of their property. He notes that even in so-called "open range" counties (counties in which owners are not required to fence in their cattle),[9] ranchers are not exempt

---

[7] See *Porter v. Thompson* (1946) 74 Cal.App.2d 474, 477 [169 P.2d 40], a case involving a cow that jumped over a fence at a cattle auction ("The fact that the defendants did not actually know that the particular cow in question was fractious, nervous or dangerous does not necessarily acquit them of negligence on that score.").

[8] Food and Agricultural Code section 16904 provides: "In any civil action which is brought by the owner, driver, or occupant of a motor vehicle, or by their personal representatives or assignees, or by the owner of livestock, for damages which are caused by collision between any motor vehicle and any domestic animal on a highway, there is no presumption or inference that the collision was due to negligence on behalf of the owner or the person in possession of the animal."

[9] Food and Agricultural Code section 17122 provides: "In any county or part of a county devoted chiefly to grazing and so declared pursuant to this article, a person shall not have the right to take up any estray animal found upon his premises, or upon premises to which he has the right of possession, nor shall he have a lien thereon, unless the premises are entirely

from the duty to use ordinary care in managing their property, including hiring additional herders, moving the sources of feed and water, or moving cattle to other areas to prevent them from straying onto highways.

Plaintiff primarily relies on *Shively, supra*, 29 Cal.App.4th 1620. In *Shively*, a personal injury action resulted from a nighttime collision between an automobile and the defendant's full-grown Angus bull, which was lying on the highway in a county " 'devoted chiefly to grazing' " within the meaning of the open range law. (*Id.* at p. 1624.) The trial court granted the defendant's motion for summary judgment. Relying on the open range law, the trial court ruled that the defendant owed no duty to the plaintiffs because the plaintiffs had failed to set forth any basis to establish that duty, notwithstanding their suggestions of preventative measures other than fencing. (*Id.* at pp. 1626–1627.) The Court of Appeal reversed. The appellate court held that the open range law does not purport to comprehensively define the duty of the cattle owner, and it does not exempt cattle owners from the duty of ordinary care under Civil Code section 1714.[10] The court concluded the trial court erred in granting defendant's motion for summary judgment, as the fact that it was not required to fence in its cattle did not show as a matter of law that it had not breached its duty of ordinary care. (*Shively, supra*, at p. 1633.)

In *Shively*, as in all the cases our research has uncovered involving vehicular accidents and livestock, the focus has been on public road contacts.[11] In contrast, here we are dealing with an easement and a private road or driveway that is shared by several parties. Those who utilize the easement have consciously opted to do nothing to curb a herd that pastures regularly on both sides of the easement and has done so for decades. No evidence was offered to show that the easement owners had ever attempted to fence in the road, and, indeed, Mr. Stenberg testified that had the owners desired to do so, he would have cooperated in its construction. In sum, the trial court did not err in granting defendants' motion for nonsuit.

---

enclosed with a good and substantial fence." Under Food and Agricultural Code section 17123, Trinity, Shasta, Siskiyou, Lassen, and Modoc are defined as grazing counties.

[10] Civil Code section 1714, subdivision (a), provides, in part: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

[11] See, e.g., *Kenney v. Antonetti* (1931) 211 Cal. 336 [295 P. 341] (horses on highway); *Bilderback v. U.S.* (D.Or. 1982) 558 F.Supp. 903 (pack horse on highway within a national forest); *Mitchell v. Ridgway* (1966) 77 N.M. 249 [421 P.2d 778] (horse on highway); *Larson-Murphy v. Steiner* (2000) 2000 MT 334 [303 Mont. 96, 15 P.3d 1205] (bull standing in middle of highway).

## DISPOSITION

The judgment is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 15, 2012, S203865.